IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ZACHARY CLAMPITT,                    )
                                     )
                Petitioner,          )
                                     )
        v.                           )       Case No.  1:21-cv-00099-AGF
                                     )
BILL STANGE,                         )
                                     )
                Respondent.          )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner Zachary Clampitt for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of three counts: first-degree murder, armed criminal action, and second-degree burglary.  Petitioner was sentenced as a prior and persistent offender to life imprisonment without parole for the first-degree murder, 100 years' imprisonment for the armed criminal action, and 15 years' imprisonment for the second-degree burglary, with each sentence to run consecutively.

In his federal habeas petition, Petitioner asserts that trial counsel provided ineffective assistance in failing to: (1) investigate, call witnesses, and introduce evidence to impeach the State's witness and Petitioner's co-defendant, Tyson Fortner; (2) challenge the testimony of Missouri State Highway Patrol ("MSHP") crime lab criminalist, Alexander Belt; (3) object and preserve unspecified issues for appeal; and (4) submit a felony murder jury instruction.  For the reasons set forth below, habeas relief will be denied.

# BACKGROUND

## Trial

The evidence at trial showed the following, as summarized by the Missouri Court of Appeals in its Order denying Petitioner's amended motion for post-conviction relief[1]:

> In the early morning hours on April 25, 2012, [Petitioner] and Tyson M. Fortner, a co-defendant, traveled in a car driven by [Petitioner] to a remote location in rural Reynolds County.   According to Fortner, who testified pursuant to a plea agreement and had unrelated convictions and a pending concurrent sentence for "receiving stolen property," [Petitioner] told Fortner "somebody owed [Petitioner] some money," and [Petitioner] "was going to collect his money."   On arriving at a cabin and shed, [Petitioner] began looking through and removing items from the shed and handing those items to Fortner who was standing outside the shed.  Fortner also "[w]ent through" one or more of a utility terrain vehicle (a "Gator") and two all terrain vehicles ("four wheelers") at the location.  In the course of doing so, Fortner observed [Petitioner] looking in a front window of the cabin and subsequently heard "gunshots" – "[t]hree or four. I want to say it was three."  "[A]s soon as [he] heard gunshots," Fortner "[t]ook off running" "[t]o the car" and got into the passenger side of the car.  Shortly after Fortner got into the car, [Petitioner] also returned to and entered the car.  Fortner observed [Petitioner] place a "black" pistol on [Petitioner]'s lap – the pistol was not a "revolver."  As [Petitioner] started the car, [Petitioner] said "he shot a guy."  As [Petitioner] was driving away, [Petitioner] "told [Fortner] not to tell anybody and if it ever came down to it he'd take rap [sic] for it."  [Petitioner] also threatened "to shoot [Fortner] or burn [his] house down" if Fortner "ever said anything."

> A "couple of days later," [Petitioner] showed Fortner what Fortner "guess[ed] [was an] obituary . . . on a phone," and said "this is the old boy I shot."

> The victim, who was sleeping on a couch in the cabin, was shot twice in the back and once in the right hand through a front window, and died from the gunshot wounds to the back shortly after being shot.

> On the date of the shooting, two expended bullets (referred to in this opinion for ease of identification as bullet A and bullet B) and a fragment of

---

[1]     The appellate court's summary accurately reflects the testimony and evidence in the case.  *See generally* Resp. Ex. A.

2

a bullet were recovered from the couch where the victim was sleeping. Another expended bullet (referred to in this opinion for ease of identification as bullet C) and a fragment of a bullet were recovered from the victim's torso during an autopsy.  In addition, two .380 caliber "shell casings" were found outside the broken front window of the cabin through which the victim was shot.

Resp. Ex. J at 5–6 (footnote omitted).

a.  Evidence Regarding Petitioner's Prior Bad Ats

During the State's opening statement, the prosecutor discussed how Petitioner and

Fortner knew each other, stating as follows:

Now what we do know is this. That [Petitioner] and his buddy named Tyson Fortner met up, [Petitioner] picked him up, picked his buddy up, and they went out to rob this place in the wee hours of the morning. and this was nothing new. Mr. Fortner's going to testify against him by the way. His buddy said this was nothing new.  They had been out robbing places before.

Resp. Ex. A at 138:2–9.

Likewise, Fortner testified as to his relationship with Petitioner.  Specifically, the

prosecutor engaged Fortner in the following line of questioning:

[Prosecutor:] At some point obviously we know about the whole [murder-victim] situation I want to backtrack to that. Did you guys ever evolve into doing break-in crimes together?

[Fortner:] Yes.

[Prosecutor:] Was that when you guys were in high school or was that something that happened after you guys were both out of high school?

[Fortner:] After high school.

[Prosecutor:] How did you get involved if you remember with [Petitioner] in doing that?

[Fortner:] Started doing drugs and started doing it with him, breaking in cars and houses.

[Prosecutor:] You say started doing drugs, were you guys doing drugs together?

[Fortner:] Yes.

[Prosecutor:] Okay and what was your drug of choice?

[Fortner:] Mine was pain pills.

[Prosecutor:] And so was the breaking and entering was that associated with paying for that habit?

[Fortner:] Yes.

[Prosecutor:] You say breaking and entering did you guys break into people's homes, did you break into people's property, cars, what did you break into?

[Fortner:] Cars and some garages.

[Prosecutor:] How would you guys know what was a good spot to hit?

[Fortner:] Just if anybody was home or not. If no cars were there then pretty much it would be a good place.

[Prosecutor:] And how did you guys figure that out?

[Fortner:] Drive by there.

[Prosecutor:] Would you drive by together or would it be one of you alone?

[Fortner:] No. Drive by together.

[Prosecutor:] So you drive by together. Are you guys hitting places in your own, starting out are you hitting places in your own home town or are you hitting places in other people's towns?

[Fortner:] Home town.

[Prosecutor:] And would you hit during the daytime, nighttime?

[Fortner:] Nighttime.

[Prosecutor:] And did you try to make sure people were gone? Or would you go ahead and take stuff while…

[Fortner:] Try to make sure people was gone.

4

[Prosecutor:] And why was that?

[Fortner:] So we wouldn't get caught.

[Prosecutor:] And when you stole stuff did you steal stuff that you had to pawn?

[Fortner:] Sell or trade it off.

[Prosecutor:] And did you guys have people you could do that with?

[Fortner:] Yes.

[Prosecutor:] Was it somebody [Petitioner] already knew, somebody you knew or someone else?

[Fortner:] Yes someone we knew.

[Prosecutor:] In all those prior times you guys broke into places do you remember if either one of you were ever armed?

[Fortner:] No.

[Prosecutor:] Did you ever arm yourself?

[Fortner:] No, no.

[Prosecutor:] And did you ever own a gun?

[Fortner:] No.

[Prosecutor:] During those times did you know if [Petitioner] owned a gun?

[Fortner:] No I've known him having guns before.

[Prosecutor:] But the times you'd go into the houses you didn't know?

[Fortner:] No

[Prosecutor:] Or at least never saw?

[Fortner:] No.

[Prosecutor:] Did you know who [the victim] was before you went out there?

[Fortner:] No.

5

[Prosecutor:] Had you ever heard of his name?

[Fortner:] No.

[Prosecutor:] And with the people you had stolen from before with [Petitioner] had you ever known who they were?

[Fortner:] No.

[Prosecutor:] Do you have an idea how many times before the [victim's] house you guys had done something together as far as taking stuff?

[Fortner:] Four to six times.

[Prosecutor:] Is that houses, cars, mix?

[Fortner:] A mix between houses and cars.

[Prosecutor:] I just want to go back to the night of April 25th, April 24th had you guys talked about this in advance?

[Fortner:] No.

[Prosecutor:] So how did you catch wind that you guys had some sort of job to do?

[Fortner:] He came by my house and my girlfriend she was supposed to go to work . . ., she left around 10:30 and he shows up around 11:00. We left between five minutes after he got there, between 11:30.

Resp. Ex. A at 208:14–212:12.

Petitioner's counsel did not object to these references to Petitioner's prior bad acts during the State's opening statement or during Fortner's testimony.

b. <u>Physical Evidence and Testimony from MSHP Officers</u>

The jury also heard the parties' stipulation of fact regarding a handgun recovered from a vehicle that Petitioner was driving, and the jury heard testimony about the physical evidence found on the scene of the crime.

Specifically, the parties stipulated to the jury that on May 19, 2012, during a lawful traffic stop of Petitioner, St. Louis County police recovered a Lorcin .380 caliber semi-automatic handgun from the driver's side door pocket of the vehicle Petitioner was driving, and that the handgun was the same handgun admitted into evidence at trial and received for testing by Alexander Belt of the MSHP.  Resp. Ex. A at 293.

Further, MSHP criminal investigator Sergeant Warren Wiedemann testified that another MSHP sergeant picked up the above-referenced handgun from the St. Louis County police and delivered the handgun to Wiedemann, who delivered it to the MSHP laboratory.  *Id.* at 297–300.

Finally, Belt testified regarding his examination of the bullets and shell casings recovered from the crime scene, and his comparison of those items to the handgun recovered from the vehicle Petitioner was driving.  Belt's testimony was summarized by the Missouri Court of Appeals as follows[2]:

> Belt, an employee assigned to the firearm and tool mark section of the MSHP crime laboratory, initially was asked to examine the bullets and shell casings recovered from the crime scene. Based on that examination, Belt testified that (1) individual characteristics of two of the bullets recovered from the crime scene (one recovered from the couch where the victim was sleeping, and one recovered from the victim's torso during the autopsy – i.e., bullets B and C as labeled in this opinion) enabled him "to identify" the two expended bullets "as coming from the same firearm"; (2) his examination was "inconclusive" as to the other bullet recovered from the couch where the victim was sleeping (i.e., bullet A as labeled in this opinion); (3) two of the cartridge casings he examined were "380 auto caliber," but he could not tell "whether or not [the two cartridge casings] were from a revolver or a semi-automatic firearm," and his examination was "inconclusive" as to whether the two cartridge casings were "fired from the same firearm"; and (4) "380

---

[2]     Again, the appellate court's summary accurately reflects Belt's testimony.  *See* Resp. Ex. A at 325–46.

auto" cartridges are included in the "38 caliber class" as were the two bullets recovered from the couch and the bullet recovered from the victim's torso.

Following Belt's initial examination of the bullets and cartridge casings, the Lorcin handgun recovered from a vehicle [Petitioner] was driving in St. Louis County, as well as a "magazine, some live cartridges and some test standards," were submitted to Belt in 2013 for comparison to the expended bullets and cartridge casings recovered from the crime scene that he previously had examined. Belt received the handgun, magazine, live cartridges and test standards from the MSHP, which had received these items from the St. Louis County Police Department. Test standards are expended bullets and cartridge cases fired by a specific firearm and retained for "possible future use." Belt's preliminary inspection of the handgun revealed "some rust" in the bore, and Belt "chose to remove it" by using "a solution called evaporust." Belt then test fired six rounds (two cartridges submitted with the handgun, and four cartridges from the laboratory's reference ammunition stock) through the handgun using the magazine submitted with the handgun and creating twelve test standards – six expended bullets and six expended cartridges. Belt's examination of the newly created six expended bullet test standards was inconclusive as to whether the test standards themselves could be identified as having been fired from the same firearm – which "could have been a function of the . . . de-rusting."

Belt then compared the bullet test standards submitted with the handgun to the expended bullets recovered from the couch and the victim's torso (i.e., bullets A, B and C as labeled in this opinion). At the outset of this testimony, the following colloquy occurred:

> [Prosecutor:] Did you have another source of test standards from the firearm that you could use to perform that kind of analysis?
>
> [Prosecutor:] What was the other source?
>
> [Belt:] They were the test standards that were submitted in the container.
>
> [Prosecutor:] And those were the test standards that you showed the jury just a moment ago?
>
> [Belt:] Yes.

[Prosecutor:] Now did you verify prior to performing any additional analysis that those test standard [sic] came from that gun?

[Belt:] I called the St. Louis police department crime lab and spoke with the firearms examiner that had been assigned to this case.

[Prosecutor:] And what did they tell you?

[Defense counsel]: Judge I'm going to object to hearsay on that part.

[Prosecutor]: Your honor may we approach?

The Court: Yes. (bench conference had at this time).

The Court: How is it not hearsay?

[Prosecutor]: He's an expert witness and he's entitled to rely on hearsay to form his opinion. He will not testify to any analysis of the St. Louis examiner just that that's where they got the test standards from that were submitted with that gun. I think he's an expert and he's entitled to rely on like a medical examiner is.

The Court: That is true he is entitled to rely on evidence that maybe [sic] otherwise inadmissible.

[Defense counsel]: We'll still continue to object for the record[,] judge.

The Court: Okay. The objection is going to be overruled but if you desire some sort of instruction I'll be glad to consider that.

[Belt:] Yes I did.

[Defense counsel]: We'll see where he goes with it[,] judge.

The Court: Okay. (bench conference concluded at this time).

The Court: You may continue.

[Prosecutor:] Mr. Belt[,] what did the examiner tell you that you spoke with at St. Louis County?

9

[Belt:] He said they were his test standards and I could use those.

[Prosecutor:] Did he indicate that they had come from that firearm?

[Belt:] Based on his conversation with me yes.

[Prosecutor:] Now have you often had situations where different agencies have provided you the test standards that they used?

[Belt:] This was a first for me.

[Prosecutor:] What did you do after you verified with St. Louis County that the test standards that were submitted with this gun had come from [this gun]?

[Belt:] I compared them under the comparison microscope.

Before comparing the "test standards . . . from the St. Louis lab" to the expended bullets from the crime scene, Belt compared the test standards to "one another" and determined there were "sufficient individual characteristics for me to identify those test standards to one another." Belt then compared the test standards to the expended bullets from the crime scene. Belt's opinion was that one of the expended bullets recovered from the couch (i.e., bullet A as labeled in this opinion) "was fired from" the handgun recovered from a vehicle [Petitioner] was driving in St. Louis County and admitted at trial.

Belt's comparison was "inconclusive" "as to whether" the other expended bullet recovered from the couch and the expended bullet recovered from the victim's torso (i.e., bullets B and C as labeled in this opinion) "were fired" from the handgun admitted at trial. Belt then compared the expended cartridge test standards that he himself had created with the handgun admitted at trial to the two, expended .380 auto caliber cartridges recovered outside the cabin, and concluded that the two cartridges "were fired from" the handgun admitted at trial.

Resp. Ex. J at 6–11 (footnote omitted) (quoting Resp. Ex. A at 347:4–349:12).

Petitioner's counsel did not object further to Belt's testimony. Petitioner did not

testify and did not present any evidence or witnesses. As noted above, a jury convicted

Petitioner of the three counts charged: first-degree murder, armed criminal action, and second-degree burglary.

**Direct Appeal**

On direct appeal, Petitioner, through appointed counsel, argued that the trial court abused its discretion in sustaining the State's objections to Petitioner's cross examination of two witnesses: (1) Fortner, regarding the conditions of Fortner's plea bargain with the State on other charges unrelated to the incident in question; and (2) the Sheriff who investigated the incident in question, regarding other suspects, including the victim's wife.  Resp. Ex. B.

The Missouri Court of Appeals rejected both arguments because Petitioner failed to preserve the issues for appellate review by failing to make an offer of proof with respect to both.  Resp. Ex. E.

**State Post-Conviction Proceedings**

In his pro se motion for post-conviction relief, Petitioner asserted a variety of ineffective assistance of counsel claims.  Resp. Ex. I at 30–41.  In his amended motion for post-conviction relief, filed with the assistance of counsel, Petitioner expanded upon his claims that trial counsel was ineffective for: (1) failing to investigate, call witnesses, and introduce evidence to impeach Fortner; (2) failing to challenge the analysis and testimony of MSHP crime lab criminalist Belt; (3) failing to object and to properly preserve issues for appeal, including references to Petitioner's prior bad acts in both the State's opening statement and in Fortner's testimony, other improper statements in the State's opening statement and closing argument, and the issues raised on direct appeal for

which trial counsel failed to make an offer of proof; and (4) failing to submit a second-degree felony murder instruction.  Petitioner also asserted that (5) appellate counsel was ineffective for failing to raise plain error issues on appeal.  Resp. Ex. I at 46–83.

a. <u>Post-Conviction Evidentiary Hearing</u>

The motion court held an evidentiary hearing, at which Petitioner's trial counsel and MSHP crime lab criminalist Belt both testified.  Resp. Ex. F.

Belt testified regarding his examination of the physical evidence.  In particular, Belt testified that he received a box from the St. Louis County Crime Lab containing "a pistol, a magazine, cartridges and test standards from the pistol."  Resp. Ex. F at 16:15–17:3.  Belt confirmed that the pistol was a Lorcin .380 caliber semi-automatic handgun. Belt testified that he did not create the test standards that were contained in the box from the St. louis County Crime Lab, but that he spoke to the St. Louis County Crime Lab firearms examiner who had actually test fired the gun.  *Id.* at 14:15-19, 17:4-8.  Belt testified that he did not recall any markings on the envelope containing the test standards or any lab reports accompanying the test standards, he did not know what protocols or methods the St. Louis County Crime Lab used to create the test standards, and he could not guarantee that the Lorcin handgun was in the exact same condition when he (Belt) test fired it as it was when the St. Louis County Crime Lab test fired it.  Resp. Ex. F at 27–30.

Petitioner's trial counsel, Steven Lynxwiler, also testified regarding his decision not to object to either Belt's testimony regarding the St. Louis County Crime Lab's test standards or to references to Petitioner's prior bad acts in the State's opening statement

and in Fortner's testimony.  Specifically, Lynxwiler testified that his defense strategy was to make Fortner "look like the biggest liar," and to make it seem that "that [Fortner] did this and not [Petitioner]." *Id.* at 35:11–13; 44:16–19.  Lynxwiler could not recall whether his failure to object to Belt's testimony regarding the St. Louis County Crime Lab test standards was strategic.  He agreed that a lack-of-foundation objection to such testimony would have been viable, but he also testified that he may not have asserted such an objection to the chain of custody because he knew he wanted to avoid introducing any adverse facts related to the traffic stop of Petitioner during which St. Louis County Police recovered the handgun.[3]  *Id.* at 48–52, 68–70.

 Regarding his failure to object to testimony regarding Petitioner's prior bad acts, Lynxwiler stated that his trial strategy was to "try to pin as much of this on [Fortner] as [he] could and while trying to keep the St. Louis stuff out with [Petitioner]," and that he "didn't have as much of an issue with some of the other things coming in because quite honestly [he] thought [Fortner] was a bum," and he "wanted to try to prove that as much as [he] could and that [Petitioner] was a victim of circumstance . . . ." *Id.* at 55:19–25. Lynxwiler added that his strategy also was to make it seem that Fortner was the assailant. *Id.* at 57:9–13.

On September 12, 2019, the motion court denied Petitioner's motion for post-conviction relief.  Resp. Ex. I at 151–68.

---

[3]        These facts included an allegation that Petitioner attempted to run over an officer during the traffic stop.

b.  <u>Missouri Court of Appeals Ruling on Post-Conviction Relief</u>

On appeal from the denial of post-conviction relief, Petitioner, through appointed counsel, pursued only his claims that trial counsel was ineffective for: (1) "failing to object to the lack of foundation for Alexander Belt's testimony about his comparison of bullets purportedly test-fired by another firearms examiner to the bullets from the crime scene," and (2) "failing to object to references in the state's opening statement and during Tyson Fortner's testimony that [Petitioner] committed various other crimes before the date of the charged conduct."  Resp. Ex. G at 18–19.  Petitioner did not pursue any of his other post-conviction claims on appeal.

In affirming the denial of post-conviction relief, the Missouri Court of Appeals held that both of Petitioner's ineffective assistance claims were without merit.  As to Petitioner's first claim, the appellate court held that counsel's failure to object to Belt's testimony was neither unreasonable nor prejudicial.  The appellate court reasoned that a foundational objection to Belt's testimony of the sort desired by Petitioner would have been without merit because, under Missouri state law, the testimony was supported by adequate foundation.  Specifically, the appellate court held:

> In this case, Sergeant Wiedemann with the MSHP testified that another MSHP employee had picked up the handgun from the St. Louis County Police Department, and delivered the handgun to him. He in turn then delivered the handgun to the MSHP laboratory. The sealed container for the handgun also contained "test materials." Belt confirmed that the handgun as well as a "magazine, some live cartridges and some test standards" were submitted to him for examination by the MSHP, which had received the items from the St. Louis County Police Department. Belt explained that test standards are expended bullets and cartridge cases fired by a specific firearm and retained for possible future use. The motion court's findings and conclusions that these facts provided "reasonable assurance" that the St.

14

Louis County bullet test standards submitted with the handgun were bullets fired from the handgun while it was in the custody of the St. Louis County Police Department, and that the bullet test standards had not been altered since they were created were not clearly erroneous.

Resp. Ex. J at 18–19.

Further, the appellate court held that counsel's performance did not prejudice Petitioner because the challenged evidence was merely cumulative to other, undisputedly admissible evidence.  The court reasoned:

> [Petitioner] also overlooks that Belt's opinion the handgun recovered from a vehicle [Petitioner] was driving in May 2012, in St. Louis County, fired bullet A that was recovered from the couch where the victim was sleeping was cumulative to Belt's opinion that the same handgun also fired the two expended .380 caliber cartridge cases found outside the cabin. Unlike with bullet A and the St. Louis County bullet test standards, Belt's opinion with respect to the expended cartridge cases was based on the cartridge test standards that Belt himself created with the handgun. In light of the strength of the evidence and the cumulative nature of Belt's opinion that the handgun fired bullet A, [Petitioner] failed to establish prejudice attributable to trial counsel's claimed deficient performance.

Resp. Ex. J at 19.

As to Petitioner's second claim, the appellate court held that counsel's failure to object to references to Petitioner's prior bad acts was a matter of strategy and therefore not deficient.  Further, the court held that such an objection would have been without merit because the testimony was admissible under state evidentiary rules "to explain to the jury a complete and coherent story of the crimes charged."  Resp. Ex. J at 21.  Thus, the appellate court held that it was not unreasonable for Petitioner's counsel to refuse to make a meritless objection.  *Id.*

**Federal Habeas Petition**

As noted above, Petitioner now raises four claims for federal habeas relief. Petitioner asserts that trial counsel was ineffective for (1) failing to investigate, call witnesses, and introduce evidence to impeach Fortner; (2) failing to challenge the testimony of MSHP crime lab criminalist, Belt; (3) failing to object and preserve issues for appeal[4]; and (4) failing to submit a felony murder jury instruction.  Respondent argues that Claims 1 and 4 have been procedurally defaulted, and that all of the claims are without merit.

## DISCUSSION

**Legal Standard**

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.  § 2254(a).  Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that habeas relief cannot be granted unless the state court's adjudication:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

---

[4]      Petitioner does not specify what evidence should have been but was not objected to and/or what issues should have been but were not preserved for appeal.

16

28 U.S.C. § 2254(d).

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to show ineffective assistance of counsel, "a [petitioner] must show that counsel's performance was deficient," and "that the deficient performance prejudiced [his] defense." *Id.* at 687.  When "[c]onsidering an attorney's performance, [the court] must indulge a strong presumption that the conduct was reasonable, and the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted).  In other words, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (citation omitted).  In order to show prejudice, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 753 (citations omitted).

### Procedurally Defaulted Claims (Claims 1 and 4)

Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent, such that a miscarriage of justice would result by failing to consider the claim. *E.g., Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011).  The Court agrees with Respondent that Petitioner's Claims 1 (failing to investigate, call witnesses, and

17

introduce evidence to impeach Fortner) and 4 (failing to submit a felony murder jury instruction) were procedurally defaulted in state court.

Although Petitioner raised both of these claims in his amended motion for post-conviction relief, he did not pursue them on appeal from the denial of that motion.  In Missouri, "a claim [must] be presented 'at each step of the judicial process' in order to avoid default."  *Jolly v. Gammon,* 28 F.3d 51, 53 (8th Cir. 1994) (quoting *Benson v. State*, 611 S.W.2d 538, 541 (Mo. Ct. App. 1980)).  "Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review."  *Id.*

Petitioner has not shown cause to excuse the default[5] or shown that a miscarriage of justice will result if his defaulted claims are not considered.  *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (holding that a petitioner must present new evidence that affirmatively demonstrates that he is actually innocent of the crime for which he was convicted in order to fit within the miscarriage of justice exception).  The Court's review of Claims 1 and 4 is therefore barred, and those grounds cannot support a grant of federal habeas relief.

**Remaining Claims (Claims 2 and 3)**

As to the grounds which were not defaulted, the Court concludes that each is without merit.  When addressing claims that were addressed by state courts, "[t]aken together,

---

[5]     Petitioner has not alleged ineffective assistance of post-conviction appellate counsel, and in any event, such an allegation has not been recognized as cause to excuse a procedural default in the habeas context.  *See Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012).

AEDPA and *Strickland* establish a doubly deferential standard of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted).  It is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  "Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699.

    a.   <u>Claim 2: Failing to Challenge Testimony of MSHP Crime Lab Criminalist, Belt</u>

        Petitioner's Claim 2 cannot survive the doubly deferential standard of review because the state appellate court's adjudication of Petitioner's Claim 2 did not contravene or unreasonably apply any clearly established federal law.[6]

        Specifically, the state court properly concluded that trial counsel's failure to object to Belt's testimony was neither unreasonable nor prejudicial, and therefore, Petitioner failed to satisfy either prong of the *Strickland* test.  The state court properly applied state evidentiary rules to hold that a foundational objection to Belt's testimony regarding the test standards would have been overruled.[7]  And an attorney's failure to assert a meritless

---

[6]     To the extent Petitioner's Claim 2 asserts deficiencies other than those raised in his appeal from the denial of his motion for post-conviction relief, those portions of Petitioner's claim were procedurally defaulted in state court.  *See Arnold*, 675 F.3d at 1087.

[7]     "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," and it is not within "the province of a federal habeas court to reexamine state-court determinations on state-law questions," such as the admissibility of evidence at trial.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citations omitted); *see also Bucklew v. Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006).  The record does not reflect hat Petitioner raised any constitutional arguments regarding the evidence but rather challenged the failure to object

objection does not constitute ineffective assistance.  *See, e.g., Dodge v. Robinson*, 625 F.3d 1014, 1019 (8th Cir. 2010).  Moreover, the state court correctly held that there was no reasonable probability that, but for trial counsel's failure to object to Belt's testimony regarding the test standards, the result of trial would have been different.  The testimony regarding the test standards was merely cumulative of other properly admitted physical evidence matching the handgun recovered from the vehicle Petitioner was driving to the gun used at the scene of the crime.

    b.  <u>Claim 3: Failing to Object to and Preserve Unspecified Issues for Appeal</u>

       Petitioner's Claim 3 is even more clearly without merit.  As noted above, Petitioner does not specify what evidence he believes was objectionable or what issues he believes should have been preserved for appeal.  For that reason alone, his claim must be denied.  *See, e.g.*, *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (holding that conclusory allegations are insufficient to prove an ineffective assistance of counsel claim).  Further, to the extent that Petitioner's Claim 3 attempts to raise an argument not raised in the appeal from the denial of his motion for post-conviction relief, the claim has been procedurally defaulted.  *See Arnold*, 675 F.3d at 1087.

       To the extent that Claim 3 tracks Petitioner's argument before the Missouri Court of Appeals—in other words, to the extent that Claim 3 argues ineffective assistance of counsel for failure to object to references to Petitioner's prior bad acts—the state courts'

---

to foundation and chain of custody.

rejection of such a claim is fully supported by the record and does not contravene or unreasonably apply clearly established Supreme Court precedent.

The state court credited counsel's testimony at the post-conviction evidentiary hearing that counsel's failure to object in this instance was strategic.  And "[g]enerally, trial strategy and tactics are not cognizable in a federal habeas corpus proceeding."  *Mills v. Armontrout*, 926 F.2d 773, 774 (8th Cir. 1991) (citation omitted); *Bowman v. Russell*, 2015 WL 687179, at *9 (E.D. Mo. Feb. 18, 2015).  Further, the state court properly applied state evidentiary rules to hold that an objection to references to Petitioner's prior bad acts in this context would have been overruled.  Thus, counsel's failure to assert such a meritless objection does not constitute ineffective assistance.  *See, e.g., Dodge*, 625 F.3d at 1019.  Finally, Petitioner has failed to establish prejudice.  In light of the overwhelming evidence against Petitioner, there is no reasonable probability that, but for these stray references to Petitioner's prior bad acts, the outcome of trial would have been different.

In short, each of Petitioner's claims of ineffective assistance of counsel was either procedurally defaulted in state court or properly rejected by the Missouri Court of Appeals based on the correct legal principles and a fair reading of the record.  Accordingly, the Court will deny the petition for habeas relief.

## **CONCLUSION**

The Court concludes that Petitioner is not entitled to federal habeas relief.  The Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues presented in this case debatable or wrong, for purposes

of issuing a Certificate of Appealability under 28 U.S.C. § 2254(d)(2).  *See Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (standard for issuing a Certificate of Appealability) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Zachary Clampitt for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability shall not be issued.

A separate Judgment shall accompany this Memorandum and Order.

*Audrey G. Fleissig*
_____
AUDREY G.  FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 24th day of April, 2024.